UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IAC DAYTON, LLC,<br><br>INTERNATIONAL AUTOMOTIVE COMPONENTS GROUP NORTH AMERICA, INC.,<br><br>   Plaintiffs/Counterclaim-Defendants,<br><br>   v.<br><br>NATIONAL RETIREMENT FUND,<br><br>   Defendant/Counterclaim-Plaintiff. | Civil Action No.: 7:25-cv-07243 (JGLC) |

**DEFENDANT/COUNTERCLAIM-PLAINTIFF'S RULE 56.1 STATEMENT OF MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1 of the United States District Court for the Southern District of New York, Defendant and Counterclaim-Plaintiff, the National Retirement Fund (the "Fund"), by their attorneys, McDermott Will & Schulte LLP, make the following statement of undisputed material facts in support of their Motion for Summary Judgment against Plaintiffs and Counterclaim-Defendants, IAC Dayton, LLC ("IAC Dayton") and International Automotive Components Group North America, Inc. ("IAC NA," and together with IAC Dayton, "IAC"), in the above-captioned litigation.

### I. The Parties

1. The Fund is a Taft-Hartley trust fund, established and maintained pursuant to Section 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5). (*See* IAC's Answer to the Fund's Counterclaim ("Answer to Counterclaim"), ECF 16, at ¶ 4-5.)

2. The Fund, through its board of trustees, sponsors and administers the Legacy Plan of the National Retirement Fund (the "Plan") a multiemployer plan under Section 3(37) of ERISA, 29 U.S.C. § 1002(37) and Section 4001 of ERISA, 29 U.S.C. § 1301. (*See id.* at ¶ 8.)

3. IAC is an employer within the meaning of Section 3(5) of ERISA, 29 U.S.C. §1002(5) that participated in and contributed to the Plan beginning June 1, 2007, pursuant to certain collective bargaining agreements. (*See* IAC's Complaint, ECF 1, at ¶ 17.)

## II. IAC's Withdrawal from the Fund and the Fund's Assessment of IAC's Withdrawal Liability

4. In February 2020, IAC completely withdrew from the Fund. (*See* Memorandum Opinion and Final Award in *IAC Dayton, LLC v. National Retirement Fund*, AAA Case No. 01-22-0005-3399, dated July 30, 2025, attached to Wierenga Decl. as Exhibit ("Ex.") A (the "Award")).

5. The Fund assessed IAC with withdrawal liability on March 2, 2022, in the amount of $6,724,094 (the "Assessment"). (Award at 2; the Fund's Notice and Demand to IAC, attached to Wierenga Decl. as Ex. F.)

6. In calculating IAC's withdrawal liability, Horizon Actuarial Services, LLC ("Horizon") used the actuarial assumptions selected by Jonathan Feldman (hereinafter, "Mr. Feldman"), the Fund's enrolled actuary, in 2019. (Award at 3.)

7. On April 27, 2022, IAC requested review (the "Request for Review") of the Fund's Assessment pursuant to Section 4219(b)(2) of ERISA, 29 U.S.C. § 1399(b)(2). (*Id.* at 2; Request for Review, attached to Wierenga Decl. as Ex. G, at 1-2.)

8. In the Request for Review, IAC challenged the Fund's inclusion of a facility in IAC's contribution history that IAC previously sold in a stock purchase deal. (Award at 2; Request for Review at 1.)

9. IAC also alleged in the Request for Review that the discount rate assumption used to calculate IAC's withdrawal liability violated ERISA because the rate differed from the interest

rate assumption Horizon used to determine minimum funding requirements. (Award at 2; Request for Review at 2.)

10. In response to the first issue raised in the Request for Review, on July 12, 2022, the Fund revised the Assessment to exclude contributions associated with the facility IAC previously sold. (Award at 2; Fund's Response to IAC's Request for Review ("Response to Request for Review"), attached to Wierenga Decl. as Ex. H, at NRF0001951-56.)

11. The Fund revised IAC's withdrawal liability assessment and issued a revised assessment to IAC in the amount of $3,565,687 (the "Revised Assessment"). (Award at 2; Response to Request for Review at NRF0001951.)

12. The Revised Assessment included a payment schedule consisting of 62 quarterly installments of $67,946.52 and a 63rd and final installment of $43,127.54. (Response to Request for Review at NRF0001951-1956.)

13. The 63 quarterly installments are payable over the span of 15.75 years. (*Id*.)

14. On August 24, 2022, the Fund denied IAC's challenge in the Request for Review to Horizon's use of the rate published by the Pension Benefit Guaranty Corporation (the "PBGC"), pursuant to 29 C.F.R. § 4044 (the "PBGC Rate") in the calculation of IAC's withdrawal liability. (*See* Award at 2; Response to Request for Review at NRF0001947-1949.)

### III.     The Arbitration

15. In December 2022, IAC submitted a demand for arbitration with the American Arbitration Association to challenge the Revised Assessment. (*See* Answer to Counterclaim, ECF 16, at ¶ 17.)

16. Arbitration hearings were held on January 28 and 29, 2025 (the "Arbitration Hearing") before Arbitrator Mark Stephenson, Esq. (the "Arbitrator"). (Award at 2.)

17. Mr. Feldman testified as the Fund's fact witness at the Arbitration Hearing. (*Id.*)

18. Ethan Kra (hereinafter, "Mr. Kra") testified as the Fund's expert witness at the Arbitration Hearing. (*Id.*)

19. Mitchell Hofing (hereinafter, "Mr. Hofing") testified as IAC's expert witness at the Arbitration Hearing. (*Id.* at 3.)

20. Although Mr. Hofing received a J.D., Mr. Hofing is not a lawyer and is not licensed to practice law in any jurisdiction. (*Id.*)

21. IAC cross-examined the Fund's witnesses, Mr. Kra and Mr. Feldman. (*See* January 28 hearing transcript ("Jan. 28 Tr."), attached to Wierenga Decl. as Ex. B, and January 29 hearing transcript ("Jan. 29 Tr."), attached to Wierenga Decl. as Ex. C.)

22. The Arbitrator permitted IAC to call, and IAC called, all the witnesses it wanted to call to testify at the Arbitration Hearing. (*See* Answer to Counterclaim, ECF 16, at ¶ 20.)

23. The Arbitrator entered forty-two documents into evidence at the Arbitration Hearing, including all documents IAC sought to introduce over the Fund's objections. (*See id.* at ¶ 23.)

24. On April 8, 2025, the parties submitted post-hearing briefs. (*See id.* at ¶ 28.)

25. On April 29, 2025, the parties submitted reply briefs. (*See id.*)

**IV.   The Arbitration Award**

26. On July 30, 2025, the Arbitrator issued the Award and upheld the Fund's Revised Assessment. (Award at 17-18.)

27. The Arbitrator ruled, *inter alia*, that the Fund properly used different interest and discount rate assumptions for purposes of calculating minimum funding requirements and withdrawal liability. (*Id.*)

28. The Arbitrator's ruling was based on numerous findings of fact made by the Arbitrator. (*Id.* at 3-10.)

29. The Arbitrator found, as a fact, that, as the Fund's enrolled actuary, Mr. Feldman selected actuarial assumptions for the Fund in 2019. (*Id.* at 3; Jan. 28. Tr. of the Direct Examination of Jonathan Feldman ("Feldman Direct") at 27:13-19.)

30. The Arbitrator found, as a fact, that Mr. Feldman selects assumptions for different measurements. (Award at 3-4; Legacy Plan 2020 Actuarial Valuation, attached to the Declaration of Andrew B. Lowy, dated November 25, 2025 ("Lowy Decl.") as Ex. 5, at 34-42.)

31. The Arbitrator found, as a fact, that Mr. Feldman followed the Actuarial Standards of Practice ("ASOPs") when selecting assumptions for different measurements. (*See* Award at 8-9; *see* ASOP No. 1 (Actuarial Standards Bd. 2013), attached to Lowy Decl. as Ex. 3, Section 4.1 at 6.)

**A.   The Arbitrator's Factual Findings Concerning the Selection of Actuarial Assumptions for Purposes of Determining Minimum Funding Requirements**

32. The Arbitrator found, as a fact, that one measurement for which Mr. Feldman selects actuarial assumptions each year is the minimum funding requirement under ERISA. (Award at 3.)

33. The Arbitrator found, as a fact, that the minimum funding requirement is "the minimum amount that an employer must contribute to a plan each year to avoid a funding deficiency." (*Id.* at 3; *see* Feldman Direct 19:7-20.)

34. The Arbitrator found, as a fact, that for purposes of measuring the minimum funding requirement, Mr. Feldman selects, *inter alia*, an interest rate assumption, a non-disabled mortality assumption, a disabled mortality assumption, a retirement assumption, a spousal age

assumption, a percent married assumption, a form of payment assumption, a withdrawal rate assumption, and an administrative cost assumption. (Award at 4.)

35. The Arbitrator found, as a fact, that Mr. Feldman selected 7.3% as the interest rate assumption for minimum funding purposes. (*See id.* at 6; Feldman Direct 23:10-24.)

**B.   The Arbitrator's Factual Findings Concerning the Selection of Actuarial Assumptions for Purposes of Determining Withdrawal Liability**

36. The Arbitrator found, as a fact, that Mr. Feldman selects actuarial assumptions each year for purposes of measuring withdrawal liability. (Award at 3-4.)

37. The Arbitrator found, as a fact, that withdrawal liability is an employer's allocable portion of unfunded vested benefits that it must pay to a multiemployer pension fund upon the employer's withdrawal. Section 4201(b)(1) of ERISA, 29 U.S.C. § 1381(b)(1); (Award at 3-4.)

38. The Arbitrator found, as a fact, and every witness (including IAC's expert) agreed, that withdrawal liability is a "settlement." (Award at 7, 11-12; Jan. 29 Tr. of the Cross Examination of Mr. Hofing ("Hofing Cross") at 409:14-22; Jan. 28 Tr. of the Cross Examination of Mr. Feldman ("Feldman Cross") at 135:11-23; Jan. 29 Tr. of the Cross Examination of Mr. Kra at 316:11-14.)

39. The Arbitrator found, as a fact, that Mr. Feldman's and Mr. Hofing's "agreed understanding" that withdrawal liability is a settlement "is consistent with common usage, *i.e.*, that a party pays another in exchange for the release of all claims." (*See* Award at 7.)

40. The Arbitrator found, as a fact, that for purposes of withdrawal liability, Mr. Feldman selects, *inter alia*, a discount rate assumption, a non-disabled mortality assumption, a disabled mortality assumption, a retirement assumption, a spousal age assumption, a percent married assumption, a withdrawal rate assumption, and a form of payment assumption. (Expert Report of Ethan E. Kra, dated April 3, 2024 ("Kra Report"), attached to Lowy Decl. as Ex. 1, at ¶

24; *see* Jan 28 Tr. of the Direct Examination of Ethan E. Kra ("Kra Direct") at 206:4-208:6; Award at 4.)

41. The Arbitrator found, as a fact, that a discount rate assumption is a type of interest rate assumption that measures the present value of a liability by discounting future plan payments to their present value. (Award at 7; *see* Transcript of the Deposition of Mitchell Hofing, attached to Lowy Decl. as Ex. 2 ("Hofing Dep. Tr.") at 48:13-18.)

42. The Arbitrator found, as a fact, that a discount rate is applied to determine the present value of a plan's future benefit obligations. (Award at 7.)

43. The Arbitrator found, as a fact, that Mr. Feldman selected the PBGC Rate as the discount rate for purposes of calculating withdrawal liability. (*Id.* at 17; Feldman Direct 48:16-19.)

44. The Arbitrator found, as a fact, that, "[b]y using the PBGC rate as the discount rate to calculate withdrawal liability, an actuary can measure the anticipated experience of a fund in the absence of investment risk in accordance with the ASOPs." (Award at 9.)

45. The Arbitrator found, as a fact, that in 2019, the PBGC Rate was 2.53%. (*Id.* at 8.)

46. The Arbitrator found, as a fact, that in selecting the PBGC Rate as the discount rate assumption for calculating withdrawal liability in 2019, Mr. Feldman considered the Fund's investment portfolio, including its projected rate of return and the degree of investment risk necessary to achieve that return. (*Id.* at 4-5; *see* Jan. 28 Tr. of the Re-Direct Examination of Jonathan Feldman ("Feldman Re-Direct") 180:13-182:5.)

47. The Arbitrator found, as a fact, that "Hofing conceded that investment experience is not limited to investment returns and also includes both investment returns and investment risk." (Award at 7.)

48. The Arbitrator found, as a fact, that "Mr. Feldman and Mr. Hofing agreed that a plan's investment experience includes *both* returns and risk." (*Id.*) (emphasis in original).

49. Mr. Hofing testified on cross examination as follows: "Q. And wouldn't the assets of the plan have two components as does every investment, and that is a rate of return and a risk factor? A. Those are parts of investing in any given asset. Q. Both elements, right, risk/ return? A. Correct." (Hofing Cross at 398:18-399:2.)

50. The Arbitrator found, as a fact, that investment returns are only possible to the extent a plan takes investment risk. (Award at 11-12.)

51. The Arbitrator found, as a fact, that risk is a "fundamental and inseparable part of investment experience." (*Id.* at 11.)

52. Mr. Hofing testified on cross examination that risk is a "part[] of investing in any given asset." (Hofing Cross 398:18-399:2.)

53. The Arbitrator found, as a fact, that the greater the investment risk an investor takes, the higher the investor's potential return. (*See* Award at 11, 12; Feldman Direct 65:13-22.)

54. Mr. Hofing testified on cross examination that "[i]n general, assets that have higher expected returns also have higher risk. An investor would be irrational to invest in an asset that has higher risk unless compensated by a higher expected return." (Hofing Cross 399:10-19.)

55. The Arbitrator found, as a fact, and all witnesses agree, that the potential for this higher return is referred to as the "risk premium." (*See* Award at 7; Kra Direct 292:11-25; *see* Hofing Cross 415:11-416:2.)

56. Mr. Hofing testified on cross examination that the potential for this higher return is referred to as the "risk premium." (Award at 7; Hofing Cross 415:11-416:2.)

57. The Arbitrator found, as a fact, and Mr. Kra and Mr. Hofing agreed, that the risk premium incentivizes an investor to take risk. (Award at 11, 13; Hofing Cross 415:11-416:2; *see also* Kra Direct 292:11-25.)

58. Mr. Hofing testified on cross examination that the risk premium incentivizes an investor to take risk. (Hofing Cross 415:11-416:2) ("Since an investor needs to be compensated for a more risky investment as compared to a less risky investment, the expected return on the more risky investment needs to be higher than the expected return on the less risky investment, and the difference between two expected returns is one way of viewing the risk premium.")

59. The Arbitrator found, as a fact, that Mr. Kra demonstrated that only investors who take investment risk are entitled to receive the risk premium through his testimony on the "Bader Swap" economic principle. (Award at 14.)

60. IAC did not object to or challenge Mr. Kra's testimony at the Arbitration Hearing that the Bader Swap proves that symmetry does not exist with respect to the Fund and IAC taking risk after IAC withdrew. (Hofing Dep. Tr. at 10:1-4; 10:11-18.)

61. The Arbitrator found, as a fact, that the risk premium can be calculated by taking the "difference between the fund's minimum funding rate and a risk-free rate." (Award at 7.)

62. Mr. Hofing testified at his deposition that the "difference between those rates [the minimum funding rate and a risk-free rate] would commonly be referred to as the risk premium." (Hofing Dep. Tr. at 45:3-5.)

63. The Arbitrator found, as a fact, that it was undisputed "that the PBGC rate is a reasonable proxy for a risk-free discount rate." (*See* Award at 8; *see* Hofing Cross 416:17-417:3; *see* Feldman Cross at 131:9-17.)

9

64. Mr. Hofing testified on cross examination that the PBGC Rate is a reasonable "proxy" for a risk-free rate. (*See* Hofing Cross 416:17-417:3.)

65. The Arbitrator found, as a fact, that "Mr. Hofing and Mr. Kra agreed that risk is not symmetrical, and that a withdrawing employer does not experience risk in the same way it did before it withdrew." (Award at 8; Kra Direct 256:3-257:5; Hofing Cross 414:21-415:3.)

66. Mr. Hofing testified on cross examination that risk is not symmetrical and that "[t]he withdrawing employer does not experience risk in the same way as [it] did before [it withdrew]." (Hofing Cross 414:21-415:3.)

67. The Arbitrator found, as a fact, that "[u]pon its 2020 withdrawal, IAC's withdrawal liability became fixed and its exposure to future withdrawal liability ended. Meanwhile, the Fund continued to be exposed to under and overperformance of its investments, and the potential threat to its survival." (Award at 8.)

68. The Arbitrator found, as a fact, that a fund's contributing employers, participants, and beneficiaries take all of the investment risk in a fund's portfolio. (*See* Hofing Cross 414:17-415:10; Award at 11, 12-13.)

69. The Arbitrator found, as a fact, and Mr. Kra and Mr. Feldman testified, that the Fund cannot adjust an employer's withdrawal liability to offset any shortfall if the Fund's investments underperform. (Award at 11-12; *see* Kra Direct 275:6-16; *see also* Feldman Direct 54:8-14.)

70. The Arbitrator found, as a fact, that, because the amount of withdrawal liability an employer will pay is fixed at the time of withdrawal, a withdrawn employer no longer bears the risk of the plan's underperformance and experiences no investment risk following its withdrawal. (Award at 11, 12-13.)

71. Mr. Hofing testified on cross examination that, because the amount of withdrawal liability an employer will pay is fixed at the time of withdrawal, the "total risk associated with the plan, it's borne by someone, it's borne by the plan, and inevitably the employers participating in the plan and the plan's participants." (*See* Hofing Cross 414:21-415:3.)

72. The Arbitrator found, as a fact, that "Hofing testified that when an employer withdraws from a plan, it *settles* its obligations to the fund and transfers its share of investment risk to the plan's remaining employers, participants, and beneficiaries." (Award at 10) (emphasis in original).

73. Mr. Hofing testified that when an employer withdraws from a plan, it settles its obligations to the fund and transfers its share of investment risk to the plan's remaining employers, participants, and beneficiaries. (*See* Hofing Cross 409:14-22, 414:17-415:3.)

74. The Arbitrator found, as a fact that, after an employer withdraws, whether a fund achieves projected returns, underperforms, or even loses money does not affect the amount an employer will pay to the fund in withdrawal liability. (Award at 11-12; *see also* Feldman Cross 135:11-23; Kra Direct 235:18-22.)

75. The Arbitrator found, as a fact, that only the fund and its contributing employers, participants, and beneficiaries are entitled to the benefit of the returns of the Fund's portfolio, *i.e.*, the risk premium, because only they took on the investment risk. (Award at 14.)

76. The Arbitrator found, as a fact, that withdrawn employers do not take investment risk because they settle their obligations to the plan, and consequently, these withdrawn employers are not entitled to the risk premium. (*See id.* at 11, 13.)

77. The Arbitrator found, as a fact, that a plan's underperformance does not affect the amount a withdrawn employer will pay in withdrawal liability. (*Id.* at 11, 12.)

78. The Arbitrator found, as a fact, and "Hofing testified[,] that [the withdrawn employer's] transfer of risk can be measured by taking the difference between the fund's minimum funding rate and a risk-free rate," *i.e.*, the risk premium. (*See* Award at 7; *see* Kra Direct 292:11-25; Hofing Cross 415:11-416:2.)

79. The Arbitrator found, as a fact, that the ASOPs allow actuaries to consider the transfer of risk that occurs upon an employer's withdrawal, along with "other factors," when selecting a discount rate assumption. (Award at 8.)

80. The Arbitrator found, as a fact, that if the Fund calculated IAC's withdrawal liability using a 7.3% interest rate assumption, the Fund would be guaranteeing IAC returns of 7.3% regardless of the performance of the Fund's portfolio. (*Id.* at 14.)

81. The Arbitrator found, as a fact, that, in selecting the PBGC Rate as the Fund's discount rate assumption, "Feldman considered the specific characteristics of the Fund that contributed to the risk it took in order to achieve its necessary investment returns." (*See id.* at 4-5.)

82. The Arbitrator found, as a fact, that the Fund is "in critical status" under ERISA. (*Id.* at 4; Feldman Direct 52:6-15.)

83. The Arbitrator found, as a fact, that the Fund is "negatively leveraged in that there [are] substantially more inactive and vested participants than there [are] participants who [are] still active." (Award at 4-5; Feldman Direct 51:12-13.) In 2019, the ratio of inactive to active participants was 12.9. (Legacy Plan 2020 Actuarial Valuation at 29.)

84. The Arbitrator found, as a fact, that the Fund is "frozen" to benefit accruals. (Award at 5; Feldman Direct 52:24-53:10.)

85. The Arbitrator found, as a fact, that "no new contributing employer" has joined the Fund since January 1, 2015. (Award at 5; *see* Feldman Cross 141:8-142:2.)

86. The Arbitrator found, as a fact, that "the Fund [does] not receive enough employer contributions to pay benefits and Fund expenses." (Award at 5.)

87. The Arbitrator found, as a fact, the Fund's "employer contributions would be insufficient to offset a significant investment shortfall" in the Fund's portfolio. (*Id.*).

88. The Arbitrator found, as a fact, "the Fund [is] unable to invest whatever withdrawal liability payments it receive[s] because those monies [are] being used to cover operating costs." (*Id.*).

89. The Arbitrator found, as a fact, that "[n]one of these characteristics [were] in dispute by the parties." (*Id.* at 4-5.)

90. The Arbitrator found, as a fact, that when selecting the PBGC Rate as the discount rate assumption in 2019, Mr. Feldman "consider[ed] the plan's characteristics that he had identified and concluded that the Fund was highly intolerant of any underperformance in minimum funding." (*See* Award at 10; *see* Feldman Direct 51:17-23; 73:9-20.)

91. The Arbitrator found, as a fact, that "Mr. Feldman's recognition of the Fund's intolerance for the risk of underperforming minimum funding was consistent with accepted actuarial practice." (Award at 10.)

92. The Arbitrator found, as a fact, that Mr. Feldman's selection of actuarial assumptions "would be acceptable to a reasonable actuary." (*Id.* at 18.)

93. The Arbitrator found, as a fact, that "Feldman concluded from the Fund's past and anticipated experience that that [sic] whether the Fund survived would depend on whether the Fund achieved its projected investment return of 7.3%." (*Id.* at 5.)

13

94.     The Arbitrator found, as a fact, that the PBGC Rate "reflected [Feldman's] best estimate of the Fund's anticipated experience" for purposes of withdrawal liability. (*See id.* at 18; *see* Feldman Cross 141:14-142:2.)

95.     The Arbitrator found, as a fact, that the assumptions Mr. Feldman selected for withdrawal liability "were reasonable in the aggregate." (Award at 18.)

96.     The Arbitrator further found, as a fact, that "[c]rucially, there is no credible evidence that Mr. Feldman selected a withdrawal liability discount rate to manipulate and overstate IAC's withdrawal liability." (*Id.* at 5.)

Dated: New York, New York
November 25, 2025

        MCDERMOTT WILL & SCHULTE LLP

By:   */s/ Ronald E. Richman*
      Ronald E. Richman
      Andrew B. Lowy
      Alessandra R. Cartolano

      919 Third Avenue
      New York, NY 10022
      Telephone: 212.756.2000
      Ronald.Richman@srz.com
      Andrew.Lowy@srz.com
      Alessandra.Cartolano@srz.com

      *Attorneys for*
      *Defendant/Counterclaim-Plaintiff*