UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IAC DAYTON, LLC, and INTERNATIONAL AUTOMOTIVE COMPONENTS GROUP NORTH AMERICA, INC., Plaintiffs/Counterclaim-Defendants, | | **OPINION AND ORDER** |
| v. | | 25 CV 7243 (VB) |
| NATIONAL RETIREMENT FUND, Defendant/Counterclaim-Plaintiff. | | |

Briccetti, J.:

Plaintiffs/counterclaim-defendants IAC Dayton, LLC, and International Automotive Components Group North America, Inc. (collectively, "IAC"), bring this action to vacate an arbitral award issued under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), in favor of defendant/counterclaim-plaintiff National Retirement Fund (the "Fund").

Now pending is IAC's motion for summary judgment to vacate the arbitrator's award (Doc. #19) and the Fund's cross-motion for summary judgment to confirm the award. (Doc. #25).

For the reasons set forth below, the arbitral award is vacated and remanded for recalculation of IAC's withdrawal liability in accordance with the Court's direction.

The Court has subject matter jurisdiction pursuant to 29 U.S.C. §§ 1401(b)(2) and 1451(c).

## BACKGROUND

The parties have submitted briefs, statements of material facts pursuant to Local Civil Rule 56.1, and declarations with exhibits. These submissions reflect the following factual background.

I. Withdrawal from Multiemployer Pension Plans

Multiemployer pension plans, like the one at issue here, are when "multiple employers pool contributions into a single fund that pays benefits to covered retirees who spent a certain amount of time working for one or more of the contributing employers." Trs. of Loc. 138 Pension Tr. Fund v. F.W. Honerkamp Co., 692 F.3d 127, 129 (2d Cir. 2012).[1] When an employer withdraws from a multiemployer plan it reduces the plan's contribution base and pushes the contribution rate for remaining employers to higher levels to fund past service liabilities. Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 722 n.2 (1984). Thus, when an employer withdraws, the Multiemployer Pension Plan Amendments Act ("MPPAA") "requires the employer to pay its proportionate share of the pension plan's unfunded vested benefits, known as withdrawal liability." Nat'l Ret. Fund v. Ruprecht Co., 2023 WL 4106672, at *6 (S.D.N.Y. June 21, 2023).

Calculating the unfunded vested benefits involves two basic steps. First, the plan's actuary must project the vested benefits that the plan will owe retirees in the future, based on assumptions about retirement ages, mortality rates, and so forth. See Sofco Erectors, Inc. v. Trs. of Ohio Operating Eng'rs Pension Fund, 15 F.4th 407, 418–19 (6th Cir. 2021). Then, the actuary

[1] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

must project whether the plan's current assets will suffice to pay those benefits. See id. If not, there are "unfunded" benefits, and the withdrawing employer must cover its share. See id.

Consequently, withdrawal liability is "calculated as the difference between the present value of vested benefits and the current value of the plan's assets." Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. at 725. In making that calculation, the plan's actuary must use "actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1393(a)(1).

The vested benefits must be paid in the future, and the plan's assets—which are invested in stocks, bonds, and the like—will earn a return in the meantime. See Sofco Erectors, Inc. v. Trs. of Ohio Operating Eng'rs Pension Fund, 15 F.4th at 418–19. Thus, determining whether the plan's current assets will suffice to cover its future liabilities requires an estimate of the average annual rate of return the plan will earn on its invested assets. Id. This rate of return is known as the "discount rate," because it is used to discount the plan's future liabilities to present value. See United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co., 39 F.4th 730, 735 & n.3 (D.C. Cir. 2022).[2] The minimum funding and the withdrawal liability discount rates are inversely proportional to each other. The higher the minimum funding discount rate, the less money the Fund would need, and the lower IAC's withdrawal liability would be. (Doc.# 21-1 ("Award") at 4). The Supreme Court has determined the discount rate to

[2] This opinion draws no distinction between its use of the terms "interest rate" and "discount rate." "In the minimum-funding and withdrawal-liability contexts, the terms have been used interchangeably." See Nat'l Ret. Fund v. Domestic Linen Control Grp., 2024 WL 3607316, at *2 n.2 (citing cases). The Fund's actuary also stated he used the term interchangeably. (Doc. 21-2 ("Feldman Tr.") at 60).

be the "most important" assumption in the withdrawal liability calculation. See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal., 508 U.S. 602, 633 (1993).

ERISA also requires plans to "satisfy [a] minimum funding standard applicable to the plan for any plan year." 29 U.S.C. § 1082(a)(1). Those minimum funding rules ensure that participating employers make sufficient annual contributions to the plan; they likewise require analysis of how much money the plan needs to meet its future obligations. See Sofco Erectors, Inc. v. Trs. of Ohio Operating Eng'rs Pension Fund, 15 F.4th at 418–19. For those purposes, ERISA, similarly to withdrawal liability, directs the actuary to use "reasonable" assumptions that represent "the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1084(c)(3).

II. IAC's Participation in the National Retirement Fund

The Legacy Plan of the National Retirement Fund (the "Fund") is a multiemployer pension plan. As of the 2019 plan year, the Fund had 233,989 participants, 470 contributing employers, and a funding percentage of 84.1%. IAC was a participating employer in the Fund from June 1, 2007, until February 28, 2020, when it ceased its contributions.

On March 2, 2022, the Fund issued a withdrawal liability assessment to IAC in the amount of $6,724,094. In calculating IAC's withdrawal liability, Horizon Actuarial Services, LLC, used the actuarial assumptions selected by Jonathan Feldman, the Fund's enrolled actuary (the "Actuary"). On April 27, 2022, IAC requested a review of the Fund's withdrawal liability assessment because it argued the contribution base units attributable to one of its facilities were incorrectly included and, further, because the discount rate employed to calculate the withdrawal liability assessment was improper. On August 23, 2022, the Fund reissued the withdrawal liability assessment, reducing the amount to $3,565,687 to exclude the incorrectly included

contribution base units. However, the Fund denied IAC's challenge to the discount rate employed.

When calculating IAC's withdrawal liability, the Actuary used a 2.53% discount rate, based on the rate prescribed by the Pension Benefit Guaranty Corporation ("PBGC"). "PBGC rates are used to determine the value of future liabilities for plans that are terminated by a 'mass withdrawal,' which occurs when all employers completely withdraw from a multiemployer plan. . . . When a plan undergoes a mass withdrawal, the plan must purchase annuities to cover the promised benefits unless the plan assets can be distributed in full satisfaction of all covered benefits." Sofco Erectors, Inc. v. Trs. of Ohio Operating Eng'rs Pension Fund, 15 F.4th at 420–21. The PBGC did not consider the assets held by the Fund or their likely rate of growth in determining the 2.53% rate.

IAC argued the discount rate should have been identical to or at least similar to the rate used for minimum funding. The minimum funding rate was 7.3% in 2019 and 2020. In other words, the Actuary estimated that the Fund's assets would grow at a compounding rate of 7.3% per year, and that the Fund had generally around a fifty percent chance of achieving a 7.3% return. The Actuary arrived at that estimate by reviewing growth projections for various asset classes and applying those projections to the Fund's actual assets.

If the Actuary had used the 7.3% minimum funding rate to calculate withdrawal liability, IAC asserts it would have owed $226,731 instead of $3,565,687. (Doc. #28 ¶ 25). The Fund disputes that calculation and asserts the number would be between $1,230,000 to $1,240,000. (Id.)

III. The Arbitration

In December 2022, IAC submitted a demand for arbitration with the American Arbitration Association to challenge the Fund's revised assessment of IAC's withdrawal liability. The parties selected Mark Stephenson (the "Arbitrator") to arbitrate the dispute. Hearings were held on January 28 and 29, 2025. The Actuary and the parties' expert witnesses testified at the hearings. On July 30, 2025, the Arbitrator issued his opinion and award, rejecting IAC's challenges to the Fund's calculations.

During the Arbitration, the Actuary testified he did not consider the Fund's assets in selecting the PBGC rate as the discount rate. (Feldman Tr. at 133). He also testified that although he did not recall exactly the chances that the assets of the Fund would exceed the PBGC rate, he believed it was in the range of 90 to 95%. (Id. at 134). The Actuary also acknowledged the PBGC did not survey the Fund or consider its assets when identifying the PBGC rate. He testified he selected an interest rate based on the Fund's intolerance of risk because:

> (1) the Fund was in critical status, (2) the Fund was negatively leveraged in that there were substantially more inactive and vested participants than there were participants who were still active, (3) the Fund's benefits were frozen, (4) no new contributing employer had joined the Fund since 2015, (5) the Fund did not receive enough employer contributions to pay benefits and Fund expenses, (6) employer contributions would be insufficient to offset a significant investment shortfall, and (7) the Fund was unable to invest whatever withdrawal liability payments it received because those monies were being used to cover operating costs.

(Award at 4–5).

The Arbitrator determined ERISA does not restrict actuaries from projecting a plan's "anticipated experience" to only investment returns because the plain language imposes no such limitation. He further found the Actuary's assumptions were reasonable in the aggregate and that the assumptions he selected reflected his best estimate of the Fund's anticipated experience. The

Arbitrator found in selecting the PBGC rate, the Actuary "considered the specific characteristics of the Fund that contributed to the risk it took in order to achieve its necessary investment returns." (Award at 4). Ultimately, the Arbitrator concluded the Actuary's use of the PBGC rate was permissible under ERISA and confirmed the Fund's calculation of withdrawal liability.

It was undisputed during the Arbitration that the Actuary made the actuarial assumptions at issue on his own without outside influence. The Arbitrator found there was no credible evidence the Arbitrator selected a specific discount rate in an effort to "manipulate and overstate IAC's withdrawal liability." (Award at 5).

## DISCUSSION

I. Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In deciding cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration," and need not ultimately "grant judgment as a matter of law for one side or the other." Hueblein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993). But "where the motion and cross motion seek a determination of the same issue, the Court may address them together." Royal & Sun All. Ins., PLC v. E.C.M. Transp., Inc., 2015 WL 5098119, at *2 (S.D.N.Y. Aug. 31, 2015).

"Arbitral decisions over ERISA disputes are subject to judicial review by federal courts." New York Times Co. v. Newspaper & Mail Deliverers'-Publishers' Pension Fund, 303 F. Supp.

3d 236, 242 (S.D.N.Y. 2018) (citing 29 U.S.C. § 1401(b)(2)). On a motion to vacate or confirm an arbitrator's award, legal conclusions are reviewed de novo, but factual findings are entitled to a "presumption" of correctness that is "rebuttable only by a clear preponderance of the evidence." Nat'l Ret. Fund v. Metz Culinary Mgmt., Inc., 946 F.3d 146, 149 (2d Cir. 2020), overruled on other grounds by M&K Employee Solutions, LLC v. Trustees of the IAM National Pension Fund, 146 S. Ct. 1224 (2026). "For mixed questions of law and fact, in the absence of controlling Second Circuit precedent, courts generally adopt a clear error standard of review." New York Times Co. v. Newspaper & Mail Deliverers'-Publishers' Pension Fund, 303 F. Supp. 3d at 247.

If a withdrawing employer objects to the liability calculated by the plan, the Fund's calculation of withdrawal liability is presumed correct unless the employer shows "by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." 29 U.S.C. § 1401(a)(3)(A). Moreover, the liability calculation is presumed to be correct unless the employer shows by a preponderance of the evidence that the actuary's assumptions, in the aggregate, were unreasonable, taking into account the experience of the plan and reasonable expectations, or that the plan's actuary made a significant error. 29 U.S.C. § 1401(a)(3)(B).

In this case, the primary dispute is the propriety of the interest rate assumption the Fund used to calculate withdrawal liability. The Actuary used the PBGC's published rate of 2.53%, derived from the rate of return that risk-free assets such as certain annuities would offer—rather than a rate closer to 7.3% which reflected the Fund's minimum funding rate. The Arbitrator found the use of the PBGC rate was permissible under ERISA and was the best estimate of the plan's anticipated experience. This is a determination of mixed fact and law as it concerns the statutory interpretation of ERISA—a question of law—and the specific characteristics of the

Fund and its anticipated experience—a question of fact. See N.Y. Times Co. v. Newspaper & Mail Deliverers'-Publishers' Pension Fund, 303 F. Supp. 3d at 255 (holding that an arbitrator's decision that the use of a particular interest rate for withdrawal liability in the aggregate is a mixed question of fact and law).

Accordingly, the Arbitrator's legal conclusions will be reviewed de novo, but his determination that the PBGC rate was his best estimate of the Fund's anticipated experience will be reviewed for clear error. See N.Y. Times Co. v. Newspaper & Mail Deliverers'-Publishers' Pension Fund, 303 F. Supp. 3d at 255.

## II. The Arbitrator Erred in Finding the Actuary Employed His Best Estimate of the Plan's Anticipated Experience

IAC argues the Arbitrator erred as a matter of law in accepting the use of the PBGC rate as the Actuary's best estimate of the plans anticipated experience.

The Court agrees.

### A. Legal Standard

ERISA requires that withdrawal liability assumptions be the actuary's "best estimate" of the plan's "anticipated experience." 29 U.S.C. § 1393(a). Congress specifically "directed what the actuary must estimate when making assumptions used to calculate withdrawal liability, namely a plan's anticipated future liabilities and asset returns." United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co., 39 F.4th at 738. Courts have interpreted ERISA's requirement that an actuary select the best estimate of the plans anticipated experience to mean that an "actuary must estimate how much interest the plan's assets will earn based on their anticipated rate of return." Id. This is because "[t]he interest rate must reflect the projected (or 'anticipated') growth rate of the assets of 'the plan,' not of some hypothetical basket of assets that the plan doesn't own and has no intention of buying." Nat'l Ret. Fund v. Domestic Linen

Control Grp., 2024 WL 3607316, at *4 (S.D.N.Y July 31, 2024). "[R]isk-free rates might be appropriate if a plan were invested in risk-free assets, or perhaps if it planned to invest the withdrawal liability payments in risk-free assets. But if the plan is currently and projects to be invested in riskier assets, the discount rate used to calculate withdrawal liability must reflect that fact." United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co., 39 F.4th at 738.

"[A]lthough the Second Circuit has never directly addressed this question, it has assumed that interest rates used to calculate withdrawal liability would reflect the projected growth of the plan's investments." Nat'l Ret. Fund v. Domestic Linen Control Grp., 2024 WL 3607316, at *4. Indeed, district courts in this Circuit have rejected the use of the PBGC rate as the discount rate for calculating withdrawal liability. See, e.g., Pension, Hospitalization & Benefit Plan of Elec. Indus. v. ConvergeOne Dedicates Servs., LLC, 730 F. Supp. 3d 41, 47 (S.D.N.Y. 2024); New York Times Co. v. Newspaper & Mail Deliverers'-Publishers' Pension Fund, 303 F. Supp. 3d at 256.

Other circuits that have ruled on the issue have rejected the use of the PBGC rate or the Segal blend (blending the PBGC rate and the minimum funding rate) as the discount rate in calculating withdrawal liability because it is not reflective of past or projected investment returns.[3] See United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co., 39 F.4th at 740 (vacating arbitrator's award because the PBGC rate assumption was not the actuary's "best estimate of anticipated experience under the plan."); GCIU-Emp. Ret. Fund v. MNG

[3] IAC cites Ace-Saginaw Paving Co. v. Operating Eng'rs Loc. 324 Pension Fund, 150 F.4th 502 (6th Cir. 2025), for the same proposition. But the Court does not credit it equally to the other cited precedent. In that case, there was a letter from the same actuary as in the instant case, Mr. Feldman, stating he changed the interest rate from the minimum funding rate to the PBGC rate for policy reasons. Id. at 512. No comparable evidence exists in this case.

Enters., Inc., 51 F.4th 1092, 1099 (9th Cir. 2022) (same); Sofco Erectors, Inc. v. Trs. of Ohio Operating Eng'rs Pension Fund, 15 F.4th at 421 (same as to Segal blend).

B. Analysis

The Actuary selected the PBGC rate as the discount rate used to calculate withdrawal liability, even though it was not tied to the Fund's assets. The Fund argues this was permissible under ERISA because (i) it was entitled to charge a risk premium as a withdrawing employer does not experience risk in the same way the remaining employers do and (ii) such a selection is permissible under the Actuarial Standards of Practice ("ASOP").

The Court is not persuaded.

1. The Interest Rate Employed

As detailed above, ERISA requires that when determining an employer's withdrawal liability, "actuarial assumptions and methods" must, "in the aggregate, [be] reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1393(a)(1). This requires a consideration of the plan's actual assets.

Here, the Actuary admitted he did not consider the Fund's assets when selecting the discount rate. When asked at the arbitration hearing whether he "consider[ed] the assets at all of NRF in coming up with 2.53 percent," the Actuary responded, "I'll just say no." (Feldman Tr. at 133). In fact, the Actuary testified he did not recall the chances the assets of the Fund would exceed the PBGC rate, but he believed it was in the range of 90 to 95%. (Id. at 134). The Actuary also conceded the PBGC did not survey the Fund or consider its assets when identifying the PBGC rate. (Id. at 132).

Further, the Fund's investment strategy was not focused on annuities or other risk-free

assets. (Doc. #28 ¶ 20). At the time, the Fund's asset allocation did not consist principally of risk-free or near risk-free assets. (Id.). There is also no evidence that the Fund intended to shift its investment allocation. (Id. ¶ 21). ). Risk-free rates might be appropriate if the Fund was invested in risk-free assets or intended to adjust its investment strategy. But the Fund is currently invested in riskier assets, and the discount rate used to calculate withdrawal liability must reflect that fact. United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co., 39 F.4th at 738.

Accordingly, the use of the PBGC rate clearly did not reflect the best estimate of the plan's anticipated experience.

2. The Fund's Risk Transfer Theory

The Arbitrator accepted the Fund's argument that when an employer withdraws it no longer bears the risk that the Fund's investments might yield a lower return than expected, so the Fund is justified in charging the withdrawing employer as if the Fund were going to invest in risk-free assets.[4]

The Arbitrator clearly erred by accepting the Fund's argument.

According to the Fund, it was entitled to charge a risk premium because a withdrawing employer transfers its investment risk to the remaining contributing employers such that those remaining employers must cover any shortfalls should the plan underperform. And the Fund was entitled to do so because, without citing to any precedent other than the Arbitrator's own opinion,

---

[4] The Court notes the Arbitrator did not fully engage with the parties' arguments regarding risk transfer; rather, he directly copied more than four pages from the Fund's brief "for the sake of clarity and completeness." (See Award at 11–15.) Although this was permissible and has not been taken into account in this decision, other courts have considered the "paucity of [an arbitrator's] analysis" when determining whether a clear error has been made in this context. See New York Times Co. v. Newspaper & Mail Deliverers'-Publishers' Pension Fund, 303 F. Supp. 3d at 256.

the broad language of the statute "encompasses any factor that affects a plan's 'anticipated experience.'" (Doc. #26 at 4).

This "risk transfer" argument has been repeatedly rejected, and this Court is not persuaded otherwise. See, e.g., United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co., 39 F.4th at 740 (determining an actuary who chose the PBGC rate based on the theory that risk-free rates are appropriate for withdrawal liability because the withdrawn employer no longer bears risk did not select his best estimate of anticipated experience under the plan because he did not consider the plan's past or projected investment returns).

The Fund asserts ERISA's text permits actuaries to consider any factor that implicates the financial well-being of a plan. It argues M&K Employee Solutions, LLC v. Trustees of the IAM National Pension Fund, 146 S. Ct. 1224 (2026), supports its position that the Court should not read limitations into ERISA that do not exist, such that anticipated experience is not limited to investment returns. (Doc. #40 at 1). But M&K Employee Solutions does not support that proposition. There, the Supreme Court acknowledged that to calculate withdrawal liability "the plan's actuary must predict the value of the plan's future assets and obligations." M&K Employee Solutions, LLC v. Trustees of the IAM National Pension Fund, 146 S. Ct. at 1227 (emphasis added).[5] In order to do so, the Court said, the actuary must make certain assumptions about the "anticipated growth rate of the plan's investments." Id. (emphasis added). Thus, M&K Employee Solutions bolsters this Court's understanding that the discount rate must reflect

5 The parties submitted additional briefing following the Supreme Court's decision in M&K Employee Solutions. (See Docs. ##40, 41). The issue here was not directly at issue there, but the Supreme Court warned against actuaries adopting intentionally low discount rates for withdrawal liability but high discount rates for other purposes—acknowledging that situation would be subject to challenge in arbitration." M&K Employee Solutions, LLC v. Trustees of the IAM National Pension Fund, 146 S. Ct. at 1223. The Supreme Court's acknowledgement of the potential problem is far from an endorsement of the Fund's position as it suggests.

the actual assets and anticipated returns of the plan.

Moreover, as other courts have agreed, the limitations to which the Fund objects "follow[] directly" from the text of the statute. United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co., 39 F.4th at 738 (emphasis added). "Congress directed what the actuary must estimate when making assumptions used to calculate withdrawal liability, namely a plan's anticipated future liabilities and asset returns. Such predictions necessarily turn on a plan's characteristics." Id. "As applied to the discount rate assumption, using the plan's particular characteristics means the actuary must estimate how much interest the plan's assets will earn based on their anticipated rate of return." Id.

Furthermore, the Fund's risk-based assessment "clashes with the MPPAA, which requires that the interest rate reflect the actuary's best estimate of anticipated experience under the plan—not the risk that the actuary's best estimate is wrong." Nat'l Ret. Fund v. Domestic Linen Control Grp., 2024 WL 3607316, at *4. "Factoring in a discount for conservatism after an actuary has arrived at his or her best estimate of anticipated experience would be contrary to the statutory mandate." Wachtell, Lipton, Rosen & Katz v. Comm'r, 26 F.3d 291, 296 (2d Cir. 1994).[6]

Here, the Arbitrator found the Actuary "sought a discount rate that was as near risk-free

---

[6] The Fund argues Wachtell, Lipton, Rosen & Katz v. Comm'r supports its position rather than IAC's because the Actuary was permitted to choose from a "range of reasonable assumptions, even when the assumption is at the conservative end of the range, provided the chosen assumption is the actuary's best estimate of anticipated plan experience." 26 F.3d at 296. This was because if "the Best Estimate Requirement meant an actuary had to pick the single point assumption that he thought was the most likely result, then the requirement that the assumptions be reasonable would be superfluous." United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co., 39 F.4th at 739. But here, the Actuary did not choose from a reasonable range, he chose the PBGC rate, which is untethered to the actual assets the Plan owns. The Arbitrator's findings of fact as to the reasonableness of the interest rate is addressed above.

as was available" because the Fund was highly intolerant of any underperformance in minimum funding. (Award at 10). However, Congress has been specific in statutes about when actuaries were directed to use risk-free interest rates. See United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co., 39 F.4th at 738 (citing 29 U.S.C. § 1341a(c)(2), noting how benefits must be paid "in the form of an annuity" upon the "[t]ermination of a multiemployer plan"). "But there is nothing in the statutory text to indicate that ERISA adopted a similar regime for individual withdrawals from multiemployer plans. Nor can we find any suggestion that Congress intended to give an actuary the discretion to dilute her best estimate of anticipated experience under the plan in order to shift risk onto the departing employer." Sofco Erectors, Inc. v. Trs. of Ohio Operating Eng'rs Pension Fund, 15 F.4th at 422.[7]

Even if the Fund was able to charge a risk premium,—which it is not for the reasons already stated—the Court is nevertheless not persuaded by the Fund's justification that the withdrawing employer no longer bears risk in the way that the remaining fund participants do. (Doc. #26 at 9). The Fund argues it faces ongoing investment risk, even though IAC no longer has any share of that investment risk justifying the charging of a risk premium. Id. However, IAC would also not share in any over-performance by the Fund, which would reduce future contribution obligations. This effectively nullifies the Fund's argument. See New York Times Co. v. Newspaper & Mail Deliverers'-Publishers' Pension Fund, 303 F. Supp. 3d at 255.

[7] The Arbitrator discounted the conclusions in Sofco Erectors, finding it was unlikely to be adopted by the Second Circuit because it clashed with the Actuarial Standards of Practice ("ASOP") and the Supreme Court's holding in Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal., 508 U.S. 602 at 633. (Award at 16–17). Although Sofco Erectors is not binding, this Court, reviewing the Arbitrator's conclusions of law de novo, is persuaded by the statutory interpretation and reasoning of Sofco Erectors and declines to uphold the Arbitrator's legal conclusion. See also infra II.B.3 (discussing the impact of the ASOPs on the withdrawal liability calculation).

Accordingly, the Fund was not entitled to charge a risk premium by selecting a risk-free interest rate, and the Arbitrator clearly erred by accepting the Fund's argument.

3. The Arbitrator's Reliance on the Actuarial Standards of Practice

The Arbitrator also concluded it was acceptable as a matter of law for the Actuary to use the PBGC rate because doing so is in accordance with professional standards. Specifically, ASOP 27 states, in relevant part, "[t]he actuary may use a discount rate that reflects the anticipated investment return from the pension fund," or "[a]n actuary measuring a plan's present value of benefits on a defeasance or settlement basis may use a discount rate implicit in annuity prices or other defeasance or settlement options," and the PBGC reflects the latter. Actuarial Standards Bd., Actuarial Standard of Practice No. 27, § 3.9(a), (b) ("ASOP 27"). Accordingly, according to the Arbitrator, an actuary can measure the anticipated experience of a fund in the absence of investment risk in accordance with the ASOPs by using the PBGC rate.

"But ERISA does not yield to the Actuarial Standards of Practice; the standards must succumb to the statutory requirements." Sofco Erectors, Inc. v. Trs. of Ohio Operating Eng'rs Pension Fund, 15 F.4th at 423. ASOP 27 itself contemplates such a situation where the standards and the law conflict and directs that "the actuary should comply with applicable law." United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co., 39 F.4th at 740 (quoting ASOP 27 § 1.2). Although the ASOP may provide two alternatives for how a discount rate may be selected, ERISA requires the choice that reflects "anticipated experience under the plan." Sofco Erectors, Inc. v. Trs. of Ohio Operating Eng'rs Pension Fund, 15 F.4th at 423.

Contrary to the Arbitrator's assertion (Award at 8–9), this understanding of how ASOP and ERISA interact is not at odds with Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California, 508 U.S. 602 (1993). In Concrete

Pipe, the Supreme Court upheld the presumption of correctness that attaches to actuarial assumptions in assessing withdrawal liability. Id. This Court does not question the Arbitrator's conclusion that the Actuary adhered to widely accepted actuarial practices when estimating the withdrawal liability. But the Court concludes that the statutory language in ERISA, and the various courts' interpretations of that language, is at odds with the ASOP, and the prescription in the ASOP simply must yield to ERISA's statutory directive. See Nat'l Ret. Fund v. Domestic Linen Control Grp., 2024 WL 3607316, at *6 ("Professional standards do not trump statutory requirements.").

The Fund contends that adopting this position would improperly place the Court in the role of the actuary—rather than deferring to the actuary's judgment. However, "[t]here is a difference between the 'technical judgment' a reasonable actuary might use to decide how to estimate something and the policy choice about what to estimate. A fund's determination is not insulated from review when an actuary uses otherwise reasonable assumptions to estimate the wrong thing. ERISA, not the Actuarial Standards of Practice, tells the actuary what to project." Sofco Erectors, Inc. v. Trs. of Ohio Operating Eng'rs Pension Fund, 15 F.4th at 423.

The Supreme Court's decision in M&K Employee Solutions and its analysis of the ASOP does not alter this Court's conclusions. There, the Court held the requirement in Section 1391 of ERISA that an employer's withdrawal liability be calculated "as of" the measurement date permits actuaries to select actuarial assumptions after the measurement date. 146 S. Ct. at 1227. Neither Section 1391 nor Section 1393 imposes a deadline on the selection of actuarial assumptions, so the Supreme Court considered the ASOP guidance in selecting a measurement date. Id. at 1230. However, M&K Employee Solutions is distinct from the case at hand because it does not consider a situation where actuarial standards are contrary to federal law, but rather a

situation in which the statute was silent on the issue. Ultimately, the Arbitrator erred by relying on the ASOPs when they were contrary to the statutory requirements of ERISA.

Even under clear error review, it strains reason to see how the use of no-risk PBGC bond rates can be accepted as the best estimate of the anticipated plan experience. Accordingly, the Arbitrator clearly erred and the Award must be vacated.

III. IAC's Alternative Argument That The Award May Be Vacated for Using Inconsistent Rate Assumptions in Violation of Concrete Pipe

IAC argues, in the alternative, that the Award may be vacated because the Fund improperly used inconsistent rate assumptions. (Doc. #20 at 21–26). IAC asserts Concrete Pipe requires the Fund to use consistent interest rates when calculating the rates for minimum funding and withdrawal liability. (Id.).

The Court disagrees.

Since Concrete Pipe, every court to consider the issue has held that the interest rates used to calculate withdrawal liability and minimum funding must be similar though not necessarily identical. See United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co., 39 F.4th at 740–41; see also Pension, Hospitalization & Benefit Plan of Elec. Indus. v. ConvergeOne Dedicates Servs., LLC, 730 F. Supp. 3d at 47; New York Times Co. v. Newspaper & Mail Deliverers'-Publishers' Pension Fund, 303 F. Supp. 3d at 254; Nat'l Ret. Fund v. Domestic Linen Control Grp., 2024 WL 3607316, at *7. This Court agrees with the reasoning of those cases. Accordingly, "the interest rates used for calculating withdrawal liability and minimum funding are not legally required to be identical." Nat'l Ret. Fund v. Domestic Linen Control Grp., 2024 WL 3607316, at *7.

## CONCLUSION

IAC’s motion for summary judgment to vacate the arbitrator’s award is GRANTED.

The Fund’s cross-motion for summary judgment to confirm the arbitrator’s award is DENIED.

In sum, the Court concludes the “[A]ctuary violated ERISA by using an interest rate that [he] acknowledged was not entirely based on the [Fund’s] expected return on assets.” Pension, Hospitalization & Benefit Plan of Elec. Indus. v. ConvergeOne Dedicates Servs., LLC, 730 F. Supp. 3d at 47. The Actuary's testimony that he did not consider the plan’s assets in selecting the rate, combined with the untethered selection of the PBGC rate, create “a definite and firm conviction that a mistake has been made” in accepting the PBGC rate. New York Times Co. v. Newspaper & Mail Deliverers’-Publishers’ Pension Fund, 303 F. Supp. 3d at 256. Despite the Arbitrator’s findings that the PBGC rate was the best estimate of the Fund’s anticipated experience, and his finding that the Actuary considered certain risks facing the plan, the Arbitrator’s determinations stemmed from a misinterpretation of ERISA and an impermissible application of the statute to the facts, such that a clear error was made. As such, this Court will “set the [Arbitrator’s] findings aside even though there is evidence supporting them.” Id. (quoting Wu Lin v. Lynch, 813 F.3d 122, 128 (2d Cir. 2016)). Accordingly, the Arbitrator's decision that the PBGC rate was the appropriate rate to calculate the withdrawal liability is vacated.

The case is remanded to the Arbitrator to recalculate withdrawal liability consistent with this opinion and order. In the absence of additional evidence sufficient to support a different discount rate, the Court presumes withdrawal liability should be calculated using the 7.3% rate which the Actuary put forth as his best estimate of the plan’s anticipated experience. See New

York Times Co. v. Newspaper & Mail Deliverers'-Publishers' Pension Fund, 303 F. Supp. 3d at 256.

The Clerk is instructed to terminate the motions (Docs. ##19, 25) and close this case.

Dated: September 14, 2026
White Plains, NY

SO ORDERED:

Vincent L. Briccetti
United States District Judge